STARK COUNTY BAR ASSOCIATION v. HARE.

[Cite as *Stark Cty. Bar Assn. v. Hare,* 99 Ohio St.3d 310, 2003-Ohio-3651.]

(No. 2002–2149—Submitted February 26, 2003—Decided July 23, 2003.)

**Per Curiam.**

{¶ 1} Respondent, David B. Hare of Medina, Ohio, Attorney Registration No. 0041217, was admitted to the practice of law in Ohio in 1989. On February 4, 2002, relator, Stark County Bar Association, filed a complaint charging respondent with numerous violations of the Code of Professional Responsibility. A panel appointed by the Board of Commissioners on Grievances and Discipline heard the cause, making findings of fact, conclusions of law, and a recommendation.

{¶ 2} In April 2000, respondent attempted to arrange an adoption for the first time. The birth mother, whom respondent had represented in a divorce and who still owed him $2,300 in legal fees, was pregnant with twins. Respondent learned of the pregnancy at a debtor's exam in March 2000, at which time he also learned that the birth mother was unemployed and unmarried and did not intend to marry the biological father. They discussed adoption, and he advised that he would be willing to help with the arrangements.

{¶ 3} Respondent and the birth mother disagree as to who initiated the consultation that followed; however, they met in April 2000. Although respondent had never done an adoption before, he said he had handled "a lot" of adoptions, she testified. She also testified that respondent offered to pay her for her time off work during pregnancy and for six to eight weeks after the twins' delivery, her medical bills and other expenses, and "anything" else she needed.

{¶ 4} Respondent later conceded to the panel that he had no experience in adoptions and had believed that arranging an adoption was "literally filling out forms work."

{¶ 5} The birth mother, who was scheduled to deliver in June 2000, agreed to have respondent arrange the adoption of her unborn children. Between April and June of that year, respondent issued eight checks totaling $2,889 for the birth mother's use. The birth mother testified that she applied these funds to rental payments, a motor vehicle inspection, a daughter's trip to Washington, D.C., and living expenses. One check was made out to her landlord, one to the local municipal court, and the rest to her.

{¶ 6} Respondent disputed the birth mother's testimony, insisting that as far as he knew, all of these checks had been issued to the birth mother to pay for medical expenses. He added that if some of the checks suggested otherwise, it was because his secretary had written the checks after he had signed them in

blank, although he did admit to authorizing payment for the motor vehicle inspection. Respondent also testified that he had asked the birth mother for medical receipts to justify the money he gave her, but she did not provide any. In contrast, the birth mother testified that she had not been charged for any medical expenses before the twins were born and so had not asked for reimbursement at that time.

{¶ 7} On April 28, 2000, respondent interviewed a couple who wanted to adopt the twins. He demanded a $1,500 nonrefundable retainer to pay for their interview and advised that the twins' adoptions would cost $50,000. Respondent decided to charge this amount because he knew parents who had adopted one child from a foreign country, and they had paid $25,000 in legal fees. The couple agreed to proceed, and respondent interviewed them about their background. Three days later, respondent selected the couple as the prospective adoptive parents.

{¶ 8} Respondent told the prospective adoptive parents that in addition to the $50,000 legal fee, they would also have to pay $10,000 for the birth mother's medical expenses before the births. In total, the couple paid respondent $61,500: $1,500 for the interview, $20,000 on May 12, 2000, and $40,000 on June 19, 2000. Respondent picked up the $40,000 check himself at the couple's home, explaining that he needed the money to finish paying the bills for the adoptions.

{¶ 9} Between April and June 2000, the birth mother, biological father, and prospective adoptive parents completed preliminary adoption requirements. During those proceedings, respondent assured the adoptive mother that although the court had concerns about her previous divorces, they would be able to complete the adoption because he was a friend of the probate judge. At some point, respondent also told the birth mother that he could no longer represent her in the adoption because of a conflict of interest. Respondent arranged for her representation by another attorney, telling the other attorney first that his fee would be either $134 or $143 and later that his representation would have to be on a pro bono basis. Respondent told the attorney that respondent was not taking a legal fee because the birth mother did not have any money.

{¶ 10} The birth mother delivered the twins on June 22, 2000. On June 27, 2000, respondent filed preliminary estimated accountings in probate court that were required to disclose any disbursements of value in connection with the adoptions. Respondent, who had paid living expenses to the birth mother and had received over $60,000 from the prospective adoptive parents, represented in those filings that no such disbursements had been made.

{¶ 11} The birth mother's attorney did not notice any irregularity in these accountings because respondent had told him that the birth mother had little or no money. The accountings also reflected the adoptive parents' telephonic

consent, although the adoptive mother testified that she did not recall giving her approval.

{¶ 12} Also on June 27, 2000, respondent appeared on the adoptive parents' behalf in probate court, along with the birth mother and her counsel and the birth father, for the initial consent hearing. The court awarded temporary custody of the twins to the adoptive parents subject to a final consent hearing six months later.

{¶ 13} Prior to the June 2000 hearing, respondent had permitted the birth mother to use a 1993 Oldsmobile that he said was worth $6,000. In July 2000, after the birth mother gave her initial consent to the adoptions, respondent transferred title of the vehicle to her. Respondent also filed a notice of satisfaction of the $2,300 judgment he had against the birth mother. The birth mother testified that respondent told her, "I let you go" on the judgment amount, which he quoted as $2,700. Respondent denied this and testified that he declared the judgment satisfied because he knew the birth mother had no assets.

{¶ 14} Thereafter, respondent stopped assisting the birth mother financially. According to the birth mother, he denied her request for rent, saying, "I let you go with the $2,700 for the divorce thing. * * * I'm not helping anymore." Respondent disputed this, asserting that the birth mother had demanded an additional $10,000 for herself and $5,000 for the birth father, threatening to go to the media if respondent did not pay. Respondent testified that he had refused to pay because the birth mother had never substantiated her medical expenses. The birth mother denied this, testifying that she had forwarded her medical bills to respondent and her attorney after the twins were born, but the bills had not been paid.

{¶ 15} In anticipation of the final consent hearing, respondent forwarded for the birth parents' signature the final accountings for the twins' adoptions. Again, these documents did not list any disbursements for medical expenses or attorney fees. The adoptive mother asked respondent why he had omitted the $50,000 in legal fees and $10,000 in medical expenses they had paid. Respondent explained that "in a private adoption, the monies involved do not need to be disclosed." He assured the adoptive mother that private adoptions are "done differently than an adoption agency" and that he had looked into at least ten local adoptions for which filings disclosed only court costs and the cost of birth certificates. The adoptive parents signed the accounts, and respondent filed them with the probate court on November 20, 2000.

{¶ 16} Respondent testified that he had not disclosed the attorney fees and expenses in his accountings because he had not known how to do so properly. He represented that he had placed these funds in his client trust account, had not taken any fees, and intended to inquire of the court at the final hearing how to

appropriately account for the receipts and disbursements. He assured the panel that he had meant to amend his accountings after explaining the whole situation to the probate court.

{¶ 17} On December 28, 2000, at what was to be the final adoption hearing, the birth mother withdrew her consent to the adoption, citing her unpaid medical bills. She testified that she no longer trusted respondent's representations about the twins' placement. At the same hearing, the birth mother's attorney asserted a conflict of interest and withdrew.

{¶ 18} Thereafter, the birth mother retained a third attorney, who also eventually represented the birth father. The new attorney arranged for the birth mother to become more familiar with the adoptive parents. At the birth mother's request and with the adoptive parents' consent, respondent subsequently withdrew from representing the adoptive parents. Notwithstanding this withdrawal, respondent advised the adoptive parents prior to a meeting with the birth mother and her new attorney "not to discuss money whatsoever because money in a private adoption is private."

{¶ 19} During the meeting with the birth mother's new attorney, the adoptive parents realized that the twins' adoption had been seriously mishandled. The new attorney recommended another attorney to help the adoptive parents in the adoption and in getting their money back from respondent. With her new attorney's assistance, the birth mother again consented to the twins' adoption, and the final consent hearing was rescheduled for March 23, 2001. In preparation for this hearing, the birth mother's attorney prepared amended accountings to be signed by the adoptive parents and filed at that time.

{¶ 20} On March 23, 2001, the birth parents appeared in probate court with their attorney and formally consented to the adoption. In the second stage of the proceeding, the adoptive parents, who waived counsel, dutifully disclosed in response to the probate judge's questioning their $60,000 payment to respondent. The judge considered the $60,000 payment, which respondent had failed to disclose in the only accountings that had been filed, patently improper. See R.C. 3107.10(C) and (D) (disbursements in connection with an adoption may be made only for certain administrative and custodial care costs, the birth mother's and minor's reasonable medical expenses, and reasonable legal services).

{¶ 21} As a result, the judge vacated the twins' temporary placement with the adoptive parents and ordered sheriff's deputies to place the children in temporary emergency care with Medina County Job and Family Services ("MCJFS"). The court also continued the final adoption hearing for further review of the accounts and a determination of the children's best interests. Over the next few days, the adoptive parents met with MCJFS representatives, who returned the twins to them on March 28, 2001.

{¶ 22} The adoptive parents subsequently retained another attorney, who offered to collect the legal fees from respondent on a contingent-fee basis. They later discharged that attorney, fearing that attempts to recoup their money might jeopardize the twins' adoption. Thereafter, the discharged attorney negotiated, apparently without authority, a settlement of $55,000 or $61,500 with respondent, out of which he took a contingent fee. On April 23, 2001, respondent forwarded a check for $27,500 to the attorney and promised to send a second check for the same amount "within the week" with this apology: "Obviously I would have preferred to have this matter finalized last week. * * * The overwhelming demand for refinancing has created a delay in processing my refinancing paper-work." Respondent also forwarded a release that included the adoptive parents' promise not to file a professional misconduct grievance against him. And although he later claimed that he had asked for this language to be deleted, it appeared in the adoptive parents' copy.

{¶ 23} Before the panel, respondent insisted that he had deposited the $60,000 paid by the adoptive parents into his IOLTA account to be held in trust. But relator introduced bank records suggesting that respondent had had to borrow money in order to produce the settlement proceeds. Respondent initially claimed that these records were inaccurate; however, he later admitted that he had deposited the adoptive parents' money in his personal accounts.

{¶ 24} In addition to the respondent's payment, the attorney who had negotiated the settlement eventually decided to make up the difference so that the adoptive parents recouped their entire $61,500. In the meantime, with the help of a guardian ad litem and a licensed adoption agency, the adoptive parents completed the preliminary adoption requirements again. The probate court approved the twins' adoptions in July 2002.

{¶ 25} The panel found that by charging the adoptive parents a $50,000 legal fee in these adoptions, respondent clearly violated DR 2–106(A) (charging or collecting a clearly excessive fee). The panel cited evidence indicating that local adoption lawyers charged hourly rates of $125 to $150 for customary total fees of $2,000 to $3,000 and the fact that respondent had formally accounted for only a few hours of work.

{¶ 26} The panel also found respondent in violation of DR 5–101(A)(1) (accepting employment in a conflict of interest without a client's consent after full disclosure) because he had acquired an interest in these adoptions through improper payments to the birth mother and also had not disclosed these payments to the adoptive parents. The panel further found violations of DR 5–103(A) (acquiring an improper proprietary interest in a client's case) and (B) (providing improper financial assistance to a client) because respondent had paid

the birth mother's personal expenses and given her a car, neither of which was a permissible advance of court costs or other litigation expenses.

{¶ 27} The panel additionally found respondent in violation of DR 7–102(A)(3) (knowingly failing to disclose that which an attorney is required by law to reveal), (4) (knowingly using perjured or false evidence), (5) (making a false statement of law or fact), (6) (creating or preserving evidence the attorney knows or should know is false), and (7) (counseling a client in conduct the attorney knows is illegal or fraudulent). The panel explained:

{¶ 28} "Respondent violated DR 7–102(A)(3) when he deliberately concealed and knowingly failed to disclose the fees and payments made to him by [the adoptive parents] and deliberately concealed the payments and property he gave to [the birth mother] in the accounts he prepared and filed in June and November 2000. He violated DR 7–102(A)(4) when he used the June and November 2000 Probate accounts he knew to be false. He violated DR 7–102(A)(5) and knowingly made false statements of fact in the June and November 2000 Probate accounts and in his representations to [the birth mother's second attorney] about legal fees. Respondent violated DR 7–102(A)(6) when he participated in the creation of said false Probate accounts. Further, the panel finds Respondent violated DR 7–102(A)(7) when he counseled his clients to engage in illegal and fraudulent conduct by persuading them to sign the November 2000 Probate accounts. Respondent told them it was usual procedure in private adoptions to omit all payments to the lawyer and birth mother except reimbursement of court costs and birth certificates. Respondent testified he read R.C. 3101.10 [sic, 3107.10] before he began these adoption proceedings, unequivocally giving him knowledge [as to] the extent of payments permitted to a birth mother as well as the need for complete disclosure of legal fees. The panel finds Respondent's explanation of not knowing how to account for the expenses and fees to be dishonest and finds that the testimony of [the adoptive mother] as to Respondent's advice to conceal the fees and expenses from other attorneys and the court to be truthful [and] credible * * *."

{¶ 29} Finally, the panel found that respondent violated DR 9–102(A) (failing to keep client's funds in a separate and identifiable trust account) by depositing into his personal accounts all the money paid to him by the adoptive parents, which included unearned and unapproved attorney fees as well as funds intended to be used for the birth mother's medical expenses.

{¶ 30} In recommending a sanction for this misconduct, the panel considered respondent's many character reference letters and the testimony of two character witnesses that praised respondent's competence, trustworthiness, and contributions to the legal community. The panel noted that respondent had no history of professional discipline.

{¶ 31} These mitigating factors, however, were outweighed by the aggravating circumstances of respondent's offenses. The panel concluded that respondent had dishonestly and selfishly attempted to conceal the exorbitant fee he charged for these adoptions. When called upon to answer for this misconduct, respondent consistently tried to blame others for his actions, and when that strategy proved futile, he fabricated incredible explanations or simply lied. Moreover, the effects of respondent's misconduct, which he did not acknowledge to be anything more than a case of neglect, were devastating. He victimized vulnerable clients, encouraging them to commit acts that jeopardized the twins' adoptions and could have been grounds for criminal prosecution.

{¶ 32} Relator recommended that respondent receive at least an indefinite suspension from the practice of law and, in view of respondent's prevarications during the hearing, acknowledged that the panel might well consider disbarment. The panel rejected respondent's suggestion—a six-month suspension, all stayed— and recommended that respondent be disbarred. The board adopted the panel's findings of misconduct and recommendation.

{¶ 33} We agree that respondent engaged in the cited misconduct and must be disbarred. "For an attorney to deliberately falsify documents in a judicial proceeding in an attempt to avoid disclosure of exorbitant fees and questionable payments is manifestly contrary to the professional qualities of honesty, justice, and good character." *Disciplinary Counsel v. Bell* (1984), 15 Ohio St.3d 118, 119, 15 OBR 269, 472 N.E.2d 1069. Thus, in *Bell* where another attorney attempted to prey upon and profit from the eagerness and vulnerability of parties in adoption proceedings, we excoriated that conduct as "reprehensible, inexcusable, and a grave breach of his ethical responsibilities." Id. at 120, 15 OBR 269, 472 N.E.2d 1069.

{¶ 34} We did not disbar the attorney in *Bell*, in part because he ultimately recognized the gravity and exploitive effect of his misconduct. In contrast, respondent has attempted to evade responsibility for and conceal evidence of his shameful betrayal of his clients' interests and professional oath. Disbarment is the only appropriate sanction.

{¶ 35} Upon review, we find ample support in the record for the board's findings of misconduct and recommendation. Respondent's objections, which attack the sufficiency of the evidence and justification for the board's sanction, are therefore overruled. Respondent is permanently disbarred from the practice of law in Ohio. Costs are taxed to respondent.

Judgment accordingly.

Moyer, C.J., Resnick, F.E. Sweeney, Pfeifer, Vukovich, Lundberg Stratton and O'Connor, JJ., concur.

Joseph Vukovich, J., of the Seventh Appellate District, sitting for Cook, J.

Howes, Daane, Milligan & Erwin, L.L.P., and Richard S. Milligan; Buckingham, Doolittle & Burroughs and John P. Van Abel, for relator.

Christopher J. Freeman, for respondent.