TOLEDO BAR ASSOCIATION *v.* COOK.

[Cite as *Toledo Bar Assn. v. Cook,*
114 Ohio St.3d 108, 2007-Ohio-3253.]

(No. 2006–1994—Submitted February 14, 2007—Decided July 11, 2007.)

**Per Curiam.**

{¶ 1} This court admitted respondent, Linda S. Cook of Sylvania, Ohio, Attorney Registration No. 0061876, to the practice of law in Ohio in 1993. On November 6, 2002, we suspended respondent's license to practice for one year, staying six months of the suspension on conditions, because she violated the Code of Professional Responsibility by preparing a will for an unrelated client that named her siblings' corporation as a beneficiary. *Toledo Bar Assn. v. Cook,* 97 Ohio St.3d 225, 2002-Ohio-5787, 778 N.E.2d 40. Respondent was reinstated on August 25, 2003. *Toledo Bar Assn. v. Cook,* 99 Ohio St.3d 1233, 2003-Ohio-4757, 795 N.E.2d 675.

{¶ 2} The Board of Commissioners on Grievances and Discipline recommends that we now permanently disbar respondent based on findings that she committed professional misconduct by first falsifying the deed to an elderly client's farm, then transferring the property to herself, then giving the farm to her client's church, and then taking charitable deductions for the gift. On review, we overrule respondent's objections, adopt the board's findings of misconduct, and hold that disbarment is appropriate.

{¶ 3} In Count I of the amended complaint, relator, Toledo Bar Association, alleged that in 2001, to qualify her client for Medicaid, respondent backdated a deed to 1998 to make it appear that the client's farm had not been in her estate for three years. Count I charged that respondent had thereby violated DR 1–102(A)(4) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresen-

tation) and 1–102(A)(6) (prohibiting conduct that adversely reflects on a lawyer's fitness to practice law). In Count II, relator alleged that respondent afterward gave the farm to the client's church, in accordance with the client's wishes, and then took the farm's value as a charitable deduction off her own federal income taxes for five years. Count II charged that respondent had thereby violated DR 1–102(A)(3) (prohibiting illegal conduct involving moral turpitude), 1–102(A)(4), 1–102(A)(6), 5–101(A)(1) (prohibiting a lawyer from accepting employment in which the lawyer's independent judgment on the client's behalf may be affected by the lawyer's own interests), and 5–104(A) (prohibiting a lawyer from transacting business with a client when their interests compete).

{¶ 4} A three-member panel of the board heard the cause on August 17 and 18, 2006. The panel made findings of fact and conclusions of law and recommended disbarment. The board adopted the findings of misconduct and recommendation.

{¶ 5} Respondent objects to the board's report, arguing first that no clear and convincing evidence supports the findings of misconduct. Respondent next argues that the board found misconduct not charged in the complaint and also that the panel should have heard evidence in mitigation and aggravation of the sanction separately from the evidence of misconduct. Finally, respondent argues that the recommended sanction is too severe.

## I. Objections to the Findings of Misconduct and Notice

### A. The Evidence Is Clear and Convincing

{¶ 6} Respondent's client, who was born in 1911 and has no immediate family, consulted respondent on or before May 8, 2001, about estate planning. The date of their first consultation is uncertain, as is the timing of other events in this case, because respondent's recollection differs from contemporaneous documentation. In this instance, for example, respondent claims that the client began consulting her about estate planning in May 2000; however, she did not open a case file for the client until May 8, 2001.

{¶ 7} Between May 8, 2001, and June 8, 2001, respondent apparently prepared five documents for the client: (1) a revocable living-trust agreement, (2) a will, (3) a comprehensive durable power of attorney, (4) a durable special power of attorney, and (5) an assignment of tangible personal property. Respondent also provided an invoice for her services, which listed $2,000 in legal fees and $20 in costs for recording instruments. Oddly, however, respondent demanded payment in the invoice of only "one cake" for her work.

{¶ 8} The client signed the five estate-planning documents on the date shown on the invoice—June 8, 2001.

{¶ 9} The client's living trust named respondent and the client as cotrustees. The will named respondent as the personal representative and respondent's law

firm, in which respondent and her sister are partners, as the successor personal representative. The comprehensive durable power of attorney named respondent as the client's agent with authority to exercise the enumerated powers, and the durable special power of attorney named respondent as the client's attorney-in-fact. The assignment of tangible personal property transferred all of the client's "jewelry, clothing, household good furniture, furnishings and fixtures, chinaware, silver, photographs, works of art, books, boats, automobiles, sporting goods, farm machinery, livestock, artifacts, and all other tangible articles of household goods or personal use" to the living trust under respondent's supervision.

{¶ 10} Respondent's client owned a farm valued in 2001 at $225,000. The client wanted to donate the farm to her church, but she also wanted to live on the farm as long as her health permitted and to afford any residential nursing care that she might eventually need. Respondent advised the client that she could qualify for Medicaid coverage by donating the farm and divesting herself of this asset three years before she applied to Medicaid for nursing-home care.

{¶ 11} Respondent presumably offered this advice on the authority of former Ohio Adm.Code 5101:1–39–07(C). 1989–1990 Ohio Monthly Record 1167, effective April 1, 1990. In 2001, as today, Ohio Adm.Code 5101:1–39–07 penalized a Medicaid applicant who attempted to qualify for coverage by reducing his or her own resources through an "improper transfer" of legal or equitable interests at less than fair market value within specified periods. See Ohio Adm.Code 5101:1–39–07(B)(5). The rule restricts benefit eligibility depending on the nature and timing of the transfer and establishes "look-back" periods for deciding which transfers are suspect. Id. Respondent testified that her client would be at risk for some period of ineligibility if she transferred her farm to an individual within three years prior to filing an application for Medicaid. She said the same risk loomed if the client transferred the farm to a trust within five years of the application.

{¶ 12} Having so advised her client, respondent prepared a quitclaim deed giving title of the client's farm, and reserving a life estate in the client, to herself as trustee of the client's living trust. Respondent insists that the gift was her elderly client's idea. The deed transferring the farm to respondent as trustee—"Deed A"—was recorded on July 12, 2001. Deed A bears an attestation and signature date of May 20, 1998.

{¶ 13} Respondent eventually admitted that May 20, 1998, was not the date on which Deed A was actually executed. She had no alternative. The notary public who authenticated the deed did not receive her commission until 2000.

{¶ 14} Respondent has no credible explanation for when she received, as trustee, title to her client's farm or how Deed A came to be dated years before the client sought her services. She claimed during the panel hearing that a

member of her staff had inadvertently misdated Deed A through a typographical error, that Deed A had really been executed sometime in June 2000, and that she did not realize the mistake until late in the disciplinary investigation. If Deed A had been executed in June 2000, however, the transfer would have occurred one year before the client's living trust and respondent's trusteeship even existed. When asked about this non sequitur, respondent dismissed the reference to her trustee-as-grantee status as simply another mistake in the deed.

{¶ 15} The panel and board did not believe that respondent misdated Deed A out of carelessness, and neither do we. Her explanations for this irregularity and others are convoluted and far-fetched. Moreover, her previous inconsistent accounts of when Deed A was truly executed show that, assuming she knows what the truth is, she is incapable of telling it.

{¶ 16} As a first inconsistency, we have before us this unusual written statement, which respondent prepared and had her client sign on August 30, 2001:

{¶ 17} "I * * * give Linda S. Cook permission to write off on her income tax return the gift of real property that I gave her in *1998* and she gave to the Metamora United Methodist Church on December 25, 2000." (Emphasis added.)

{¶ 18} Respondent's second inconsistent statement appears in her 2000 federal income tax return. Respondent completed this return on October 14, 2001, and it reflects the first of five charitable deductions that respondent attributed to donating her client's farm to the client's Methodist church. Respondent represented on the return that she had received title to the farm as a gift in *December 1997*.

{¶ 19} Third, in responding to questions raised early in relator's investigation, respondent approved and signed an August 18, 2004 letter in which she confirmed that she had received title to the client's farm as trustee on *May 20, 1998*.

{¶ 20} Respondent's other activities during 2000 and 2001 cast further suspicion. For example, at some point after Deed A was recorded, respondent obtained a copy of the recorded deed, crossed out the designation of "Trustee" that appeared after her name as grantee, and then typed in the word "married" above it. In explanation to the panel, respondent claimed that she had changed Deed A because she had mistakenly given the farm to herself as trustee, rather than to herself personally in accordance with her client's wishes. Respondent, who thought she might have undertaken this curious course of action in August 2001, did not have her client re-execute the document, and she supposedly did not notice the inaccurate May 20, 1998 transfer date. She instead simply re-recorded the altered deed—"Deed B"—on September 10, 2001.

{¶ 21} Respondent apparently believed that she had transferred valid title to herself individually from her client with Deed B. At the time of that attempted transfer, however, title arguably still resided, as a result of Deed A, in respondent as the living-trust trustee.

{¶ 22} Earlier, in another example of equally questionable conduct, respondent at some point prepared another quitclaim deed, this one purporting to transfer title to her client's farm from respondent, as a married individual, to the Metamora United Methodist Church and reserving a life estate for the client. This deed—"Deed C"—and an allied land-transfer contract between respondent and church trustees purport to have been signed, witnessed, and notarized on December 25, 2000.

{¶ 23} December 25, 2000, corresponds to the year of the tax return on which respondent took the first deduction for the charitable donation of the farm. Oddly, however, that date precedes the July 12 and September 10, 2001 recording dates of Deeds A and B, the deeds from which respondent supposedly obtained her personal interest in the farm. Moreover, respondent conceded that the date shown on the land contract was also inaccurate.

{¶ 24} Again trying to explain, respondent claimed that the land contract had actually been executed sometime after she established her client's June 8, 2001 trust, although she again could not recall exactly when. Respondent testified that she had at the time arranged for the church trustees to date their signatures Christmas Day 2000 to match the date on the deed. After Deed C was executed, respondent maintains that she kept the deed at her law firm and, with no more documentation of her client's intent, simply told a colleague to give the deed to the church if her client died and "in case anything happened" to respondent.

{¶ 25} Deed C was not recorded until December 13, 2001. From this date until the beginning of 2004, respondent had no further contact with her client. For the tax years of 2000, 2001, 2002, 2003, and 2004, however, she took a total of $225,000 in federal income-tax deductions for donating the client's farm to the client's church. It was to obtain proof of her client's informed consent for this tax benefit that respondent prepared and had her client sign the August 30, 2001 statement about giving respondent the farm in 1998 and allowing respondent to take the corresponding tax deductions. Also to prove the validity of these deductions, respondent included with her 2000 tax return a copy of Deed C.

{¶ 26} In late December 2003, while the client was, in respondent's words, "taking care of all of her own affairs," a local adult-protective-services agency received a report about unsafe conditions in the client's home. The agency asked respondent about the situation, and in January 2004, respondent contacted her client, she claims, "to see about paying her bills in January." On January 23, 2004, however, respondent prepared and had her client sign another statement,

this one confirming that the grantee on Deed A "should have been and is LINDA S. COOK, married," rather than "LINDA S. COOK, Trustee." Only after respondent obtained this statement from her client and her client had been hospitalized did respondent, in March 2004, ask doctors to evaluate the client's ability to live unassisted.

{¶ 27} On April 20, 2004, attorney Jeffrey L. Robinson hand-delivered a letter to respondent, advising that he had been retained to succeed her as the client's counsel. He referred to respondent's representation as "perplexing" and included the client's revocation of respondent's power of attorney. Robinson inquired about the status of the client's farm and certain personal property that respondent had removed. He also forbade respondent to contact the client.

{¶ 28} Respondent disregarded Robinson's letter. On the day she received it, she petitioned a Michigan probate court to appoint her the client's guardian, alleging the client's mental and physical incapacity. In the petition, respondent represented that she had the client's power of attorney and was the client's attorney. Respondent completed the petition by signing for her sister as her own attorney. The next day, despite the client's probable incapacitation, respondent went to the Michigan nursing home where her client was then living and had the client sign another "Comprehensive General Durable Power of Attorney," a living will, a health-care power of attorney, and a designation of patient advocate. Respondent's client was declared incompetent shortly afterward.

{¶ 29} In September 2, 2004, at Robinson's behest, respondent executed a fourth deed, this one transferring title as trustee of her client's first living trust with the accompanying life estate in the client. Robinson insisted on this deed to ensure that the church obtained clear title.

**B. Respondent Violated the Disciplinary Rules Cited in the Complaint and Had Ample Notice of the Charges**

{¶ 30} The false date and grantee designation on Deed A were not innocuous mistakes. Respondent's account is simply not credible, and the employee-cousin she presented at the panel hearing to corroborate her story did not have enough knowledge to contradict all the inconsistencies in respondent's testimony and the various instruments she prepared. In fact, the cousin created a new inconsistency—she testified that respondent knew of the inaccurate date on Deed A in 2001 and thus did not discover it, as respondent now claims, in 2004 during relator's investigation.

{¶ 31} We are convinced that respondent intentionally backdated Deed A and then changed the grantee designation to create Deed B and the appearance that her client had given the farm to an individual before the three-year look-back period for Medicaid eligibility. Then, on the theory that she had taken care of her client's long-term medical and living expenses, respondent took advantage of

her client's assets by claiming deductions for the year 2000 and afterward for a charitable contribution that we can only conclude occurred sometime after May 8, 2001. Finally, as a cure-all, respondent obtained transparent statements from her increasingly physically and mentally compromised client as proof of her client's purported consent.

{¶ 32} Respondent acted dishonestly, she did not exercise her professional judgment independently of her own interests, and she certainly has not shown that she obtained her client's informed consent to her self-dealing. Rather, she gamed the system. Then, years later, when authorities inquired into the client's desperate living conditions, respondent went to her client to initiate guardianship proceedings and, incredibly, gained the client's signature on another supposedly exculpatory consent instrument.

{¶ 33} Respondent's arguments in defense of her self-dealing are remarkable in their complete indifference to her fiduciary duties to this client. She has the audacity to argue that her machinations did no harm, explaining that the client had too little income to take the deductions for the generous charitable contribution of her farm. Respondent suggests that she actually helped her client by seeing that her charitable deduction did not go unused.

{¶ 34} Respondent further asserts that by the time she took the first deduction in October 2001, she no longer owed any duty to her client because their attorney-client relationship had ended. Respondent makes this argument notwithstanding that she never terminated her fiduciary capacities under the instruments she prepared and that in August 2004, she stepped in to prepare the petition for her client's guardianship and to try to revoke Robinson's power of attorney. Moreover, beginning in January 2004, respondent billed her client not only for her services as trustee, but also for legal work—in particular for preparing the guardianship petition that she filed on April 20, 2004, and for the comprehensive general power of attorney, living will, health-care power of attorney, and designation of patient advocate that she had her client sign on April 21, 2004. All occurred after her client had revoked respondent's power of attorney and had requested no further contact.

{¶ 35} Finally, respondent relies heavily on an exhibit that she claims is the preliminary draft of Deed A and supports her assertion that her client was considering giving her the farm as early as May or June 2000 and made delivery of the deed to it in December 2000. The year is important to respondent because she took her first charitable deduction for her contribution on her 2000 federal income tax returns. Respondent introduced this exhibit for the first time at the panel hearing, despite relator's previous discovery requests for all her records concerning this client. To authenticate the exhibit, respondent presented her nephew, also one of her employees, who allegedly discovered the document in an

old electronic file. The exhibit is a partially completed quitclaim deed, also dated May 20, 1998, that grants the client's farm, for no consideration, to "LINDA S. COOK, Trustee, or her successors in trust, under the [client's] Living Trust, Dated June 14, 2000."

{¶ 36} Respondent offered this exhibit to corroborate her claims that Deeds A and C were actually executed in 2000, no doubt in acknowledgement that no other record reliably documents the dates of these deeds. Given how respondent was suddenly able to produce it, however, we also find this record suspect. Moreover, the nephew testified that the dating of an electronically generated document is easily altered, and the date on this newly introduced, incomplete deed could not be verified.

{¶ 37} On review, we find ample proof of respondent's misconduct and nothing to suggest that she received inadequate notice of the charges against her. We find that respondent violated DR 1–102(A)(4), as specifically charged in Count I, for committing acts of dishonesty and deceit and violated 1–102(A)(6) because these acts reflect egregiously on a lawyer's fitness to practice law. We find that respondent violated DR 1–102(A)(3), 5–101(A)(1), and 5–104(A), as specifically charged in Count II, by taking advantage of her fiduciary relationship with her client and falsely claiming that she donated her client's farm in 2000. Respondent's claims of insufficient evidence and lack of notice are therefore overruled.

II. Objections to the Hearing Procedure and Sanction

A. Respondent Has Not Shown that She Is Entitled to a Bifurcated Hearing

{¶ 38} Respondent also argues that the board should have conducted the underlying panel hearing in two proceedings, with a separate hearing to determine the sanction for her misconduct and to weigh relevant mitigating and aggravating factors. She analogizes the disciplinary process to a capital-murder prosecution, arguing that the process unfairly precludes a lawyer from first pressing a defense and then choosing to show remorse in mitigation of the offense. Respondent cites no applicable authority for this argument, and without it, her general analogy warrants no further discussion. This objection is also overruled.

B. Disbarment Is Appropriate

{¶ 39} When imposing sanctions for attorney misconduct, we consider the duties violated, the actual or potential injury caused, the attorney's mental state, and sanctions imposed in similar cases. *Disciplinary Counsel v. Brown* (1999), 87 Ohio St.3d 316, 320, 720 N.E.2d 525. Before making a final determination, we also weigh evidence of the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings

Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). Id. at 321, 720 N.E.2d 525. See, also, *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16, and *Cleveland Bar Assn. v. Glatki* (2000), 88 Ohio St.3d 381, 384, 726 N.E.2d 993.

{¶ 40} By falsifying a deed and advancing her own financial interests without her client's informed consent, respondent violated duties to and harmed her client, the public, the legal system, and the legal profession. As relator observed, she demonstrated "a complete inability to act as a lawyer without engaging in habitual acts of fraud and deceit." For deliberately falsifying official documents and attempting to conceal self-dealing, we will disbar the offending lawyer. *Stark Cty. Bar Assn. v. Hare*, 99 Ohio St.3d 310, 2003-Ohio-3651, 791 N.E.2d 966, ¶ 33.

{¶ 41} Disbarment also comports with the sanction that the American Bar Association's Standards for Imposing Lawyer Sanctions ("ABA Standards") recommend for this misconduct. American Bar Association Center for Professional Responsibility, Standards for Imposing Lawyer Sanctions (2005). According to ABA Standards 4.31(a), disbarment is generally appropriate when a lawyer, acting without the client's informed consent, with interests adverse to the client's, and with the intent to benefit the lawyer, represents the client and causes serious or potentially serious injury to the client. Disbarment is also appropriate, according to ABA Standards 5.11(b), when "a lawyer engages in * * * intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice law."

{¶ 42} Moreover, no mitigating evidence warrants our lenience. Respondent has a prior disciplinary record for a previous episode of self-dealing, and her actions since then are even more dishonest and selfish. BCGD Proc.Reg. 10(B)(1)(a) and (b). She also provided deceptive explanations for her actions before and during the hearing. BCGD Proc.Reg. 10(B)(1)(f). Finally, respondent has no conception of how she violated our profession's ethical standards or why these standards even exist. BCGD Proc.Reg. 10(B)(1)(g).

{¶ 43} We therefore permanently disbar respondent from the practice of law in Ohio. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., PFEIFER, O'CONNOR, O'DONNELL, LANZINGER and CUPP, JJ., concur.

LUNDBERG STRATTON, J., dissents.

———

**LUNDBERG STRATTON, J., dissenting.**

{¶ 44} The charges against respondent, Linda Cook, are serious and may justify disbarment. However, I respectfully dissent and decline to join the majority's opinion because I believe that this court's denial of Cook's motion for a continuance of her oral argument infringed upon her due process rights.

{¶ 45} Respondent's case was scheduled for oral argument on February 14, 2007. Beginning on the 13th and continuing through the 14th, a major winter storm hit the Midwest, including Ohio and Michigan, dumping more than a foot of snow in northwest Ohio and snow and freezing rain in central Ohio. The storm wreaked havoc on travel in the region.

{¶ 46} Cook's attorney was from Lathrup Village, Michigan, over 200 miles north of Columbus. Consequently, he had made reservations to fly to Columbus from Detroit on the afternoon of February 13. However, according to the Associated Press, because of the inclement weather, "flight delays and cancellations were common at airports across [Ohio]." In fact, the attorney's flight was canceled.

{¶ 47} On the ground, conditions were no better, with 30–mile–per–hour winds and up to ten inches of snow expected in southeast Michigan by the evening of the 13th. The Michigan State Police reported a high volume of accidents.

{¶ 48} Driving in most of Ohio, and particularly northwest Ohio, which was under a blizzard warning, was likewise hazardous. The storm prompted schools, businesses, and even local governments to close. The Ohio State University in Columbus shut its doors because of weather for the first time in four years. Columbus had not seen a heavier snowfall since 2004. Even two high-profile criminal cases in Ohio were postponed. The Associated Press reported, "Sheriff's offices in some counties warned people that they could be arrested for driving * * *." In sum, this weather was unusual in its intensity and scope and impeded travel from lower Michigan through Ohio.

{¶ 49} After his flight was canceled and knowing that driving was dangerous, the attorney promptly contacted the court and moved for a continuance, which the court denied administratively.

{¶ 50} Many, if not most, weather-related conditions do not warrant a continuance. However, in my opinion the severity of the weather, as well as the sanction at issue (disbarment), in the instant case did merit a continuance here. Although no one can be certain whether argument from her attorney would have persuaded this court to impose a different penalty, I believe that the denial of that opportunity infringed upon Cook's due process rights.[1] Accordingly, I respectfully dissent.

---

1. Because of the unavailability of respondent's counsel, neither party presented an oral argument, and the case was submitted on the briefs. Nevertheless, Cook was denied her opportunity to argue her case before the court.

Jonathan B. Cherry, Bar Counsel, Michael A. Bonfiglio, and Michael J. Manahan, for relator.

Golden & Kunz, P.C., and Robert H. Golden, for respondent.