[Cite as *T.E. v. State Med. Bd.*, 2022-Ohio-1471.]

THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| [T.E., M.D.], | : | |
| Appellant-Appellant, | : | No. 21AP-142 |
| | | (C.P.C. No. 19CV-9312) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| State Medical Board of Ohio, | : | |
| Appellee-Appellee. | : | |

D E C I S I O N

Rendered on May 3, 2022

**On brief**: *Dinsmore & Shohl, LLP*, *Eric J. Plinke*, and *Heidi W. Dorn*, for appellant.  **Argued**: *Eric J. Plinke*.

**On brief**: *Dave Yost, Attorney General*, and *Katherine Bockbrader*, for appellee.  **Argued**: *Katherine Bockbrader*.

APPEAL from the Franklin County Court of Common Pleas

NELSON, J.

{¶ 1}  Sometimes bad things happen to good doctors.  Where physical problems constrain a surgeon's ability to undertake certain invasive procedures, Ohio law empowers the State Medical Board (the "board") to limit that doctor's scope of operations while still permitting him or her otherwise to engage in the practice of medicine.  This case involves courage amidst unfortunate circumstances, with frustrations compounded by the parties' sustained inability to reach accord despite what appear to be potentially broad areas of agreement over the kinds of things that the doctor should and should not be doing.

{¶ 2}  Appellant T.E. ("Dr. E.") is an accomplished cardiologist who has fought a valiant battle against the brain cancer that afflicted him starting in 2006.  He does not stand accused of any wrongdoing, and there is no claim that he has inflicted harm on anyone.  In

what the board's hearing examiner properly called "a very sad and difficult case," the board adopted an order limiting and restricting Dr. E.'s medical license so as to preclude him from performing "invasive procedures, including all cardiac electrophysiology procedures" unless and until the order is modified after specified conditions are met. November 13, 2019 Board Minutes; Hearing Examiner Report & Recommendation (received by the board October 18, 2019) at 29 (rationale and proposed order). Dr. E. filed an administrative appeal of that decision with the Franklin County Court of Common Pleas on November 19, 2019, and the common pleas court affirmed the board's order in a thorough Decision and Entry of March 10, 2021.

{¶ 3} Dr. E. has appealed that determination to us. He presents four assignments of error:

> [I.] The trial court erred as a matter of law in failing to find a due process violation resulting from the board's tainted proceedings.
>
> [II.] The trial court erred in failing to find that the board's order is contrary to law because it did not establish impairment under the plain meaning of R.C. 4731.22(B)(19).
>
> [III.] The trial court erred in failing to find that the bord's order is contrary to law because it violates disability discrimination laws.
>
> [IV.] The trial court erred in failing to find that the board's order violated due process due to the reliance on [board expert] Dr. Hanna's opinion.

Appellant's Brief at iv (capitalizations adjusted).

{¶ 4} His opening brief to us describes among other matters his distinguished career before being diagnosed with a malignant brain tumor in 2006; his subsequent brain surgery, chemotherapy, and radiation; his resumption of "noninvasive work in the office in electrophysiology"; a May 2010 "episode of a somatosensory seizure which consisted of numbness and tingling * * * similar to hitting your 'funny bone,' " running from hand to arm to shoulder, "secondarily to the face and left side of the tongue"; his halt in practicing and acknowledgment that he "randomly experienced the somatosensory seizures" in 2010 and 2011; his 2012 invocation of "full-term disability insurance * * * based on the recommendations of his treating specialist physicians that he cease practice of invasive

cardiology at that time"; his disclosure to the board in the course of filing to renew his medical license in 2014 that he had "voluntarily withdr[awn] his hospital privileges to perform invasive cardiology"; and his resulting lengthy, unsatisfactory, and he says threatening dealings with board personnel. Appellant's Brief at 10-16; *see also id.* at 22 (underscoring that he "ha[s] not practiced invasive medicine since 2010 and stopped practicing all together since 2011").

{¶ 5} Against that backdrop, we turn first to Dr. E.'s second assignment of error. We start there both because it presents a legal question that governs what the board was to assess in analyzing the proposed order on limitation of the doctor's practice (and thus, we think, goes to the heart of the case), and because it is presented in a manner somewhat less diffuse than is the argument under the first assignment. The second assignment of error turns on the meaning of the relevant statute, and therefore presents a question of law that, as the parties agree, we review de novo (afresh, without deference to the determinations below).

{¶ 6} Dr. E. contends that the statutory provision under which the board acted to impose limitations on his practice, R.C. 4731.22(B)(19), applies only in cases of a *complete* "inability to practice" and therefore does not comprehend situations in which a doctor is unable to perform some tasks within his field but able to do others. We take it that is what his brief means when it submits: "The statute is not violated on its face for a partial inability to practice; rather, it states an '[i]nability to practice' and applicability where 'unable to practice' without lesser partial or component qualifications." Appellant's Brief at 30; *see also id.* at 32 ("As such [sic], the Board's reliance on Dr. Hanna's opinion that Dr. [E.] can fully practice certain areas of medicine, but not the invasive procedures relevant here, does not comport with the plain language of R.C. 4731.22(B)(19)"). Because the board did not find Dr. E. wholly unable to practice, he submits, its conclusions about his impairment and the consequent restrictions were "not supported by reliable[,] probative[,] and substantial evidence" and therefore its order was invalid. *Id.* at 29-30.

{¶ 7} That is not how we read the law. R.C. 4731.22(B) begins by reciting (with emphasis added) that the board, by a vote of at least six members, "shall, to the extent permitted by law, *limit, revoke, or suspend* a license," refuse to issue, renew, or reinstate a license, or reprimand a license holder "for one or more of" 52 enumerated reasons. We take

from that introductory language alone that the power of the board to "limit" a license is distinct from its powers to "suspend" or to "revoke" a license. Subparagraph 19 then provides as a reason for such board action: "Inability to practice according to acceptable and prevailing standards of care by reason of * * * physical illness, including * * * physical deterioration that adversely affects cognitive, motor, *or* perceptive skills." R.C. 4731.22(B)(19) (emphasis added). We take it from that language that the statute recognizes that a doctor (as with Dr. E.) may be entirely unimpaired cognitively while suffering from adversely affected motor skills.

{¶ 8} The subsection then goes on to authorize the board to order a mental or physical examination in connection with license applications. *Id.* And the subsection makes provision for the board to allow continued practice where appropriate: "If the board finds an individual unable to practice because of the reasons set forth in this division, the board shall require the individual to submit to care, counseling, or treatment by physicians approved or designated by the board, as a condition for initial, *continued*, reinstated, or renewed authority to practice." *Id.* (emphasis added). The board also must afford the doctor "an opportunity to demonstrate to the board the ability to resume practice in compliance with acceptable and prevailing standards under the provisions of the individual's license." *Id.* (Here, the board's order to Dr. E. provided that he may "apply to the Board for modification of th[e] limitation/restriction for specific [that is, invasive] procedures upon providing written report from two physicians acceptable to the Board, one of who[m] must be a neurologist, indicating that he has been * * * deemed capable of performing those specific procedures. * * * [S]hould Dr. [E.] be able to demonstrate to the satisfaction of the Board that for five years he has been both without anticonvulsant medication and free of seizures, then the limitation/restriction would be removed altogether." March 10, 2021 Decision & Entry at 4, citing adopted Report & Recommendation at 29-30.)

{¶ 9} Especially when the (B)(19) subsection is read in full, Dr. E.'s position that "[i]nability to practice according to acceptable and prevailing standards of care" must mean and apply only to a *complete*, global inability to practice makes little sense. By its terms, the subsection says that:

- The board may "limit" (that is, impose "enforceable restrictions" on, *see Gross v. State Med. Bd.*, 10th Dist. No. 08AP-437, 2008-Ohio-6826, ¶ 36 (construing "limitation" in R.C. 4731.22(B)(22)) a license while not revoking or suspending it;

- The board may take action where a doctor maintains full "cognitive" but not full "motor" skills; and

- In acting, the board may impose care, counseling, or treatment conditions to permit "continued * * * authority to practice."

{¶ 10} Each of those explicit, textual allowances provides at least a strong tipoff that the word "[i]nability" in the statute may not mean, or, that is, may not be restricted to, a complete inability to practice. Dr. E.'s briefing seeks to wrench the word out of the context of the statute, but we are required to read the words of a statute "in context"—that is, in the context that the text of the statute itself provides—and thus to read the statutory subsection as an integrated whole. R.C. 1.42. In statutory interpretation, as in literature and life, context informs meaning. "Evaluating the context in which a word is written is essential to a fair reading of the text: 'The words of a governing text are of paramount concern, and what they convey, in their [textual] context, is what the text means.' " *Great Lakes Bar Control, Inc. v. Testa*, 156 Ohio St.3d 199, 2018-Ohio-5207, ¶ 9, quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, 56 (2012) (also quoting the same source in reciting that " 'words are given meaning by their context' ").

{¶ 11} As the General Assembly further instructs, "it is presumed that * * * [t]he entire statute is intended to be effective." R.C. 1.47(B); *see also*, *e.g.*, *State v. Pendergrass*, 162 Ohio St.3d 25, 2020-Ohio-3335, ¶ 22-24 (reading statutory provisions together to derive meaning of word from "the broader statutory language"). It would be passing strange to design a system so that a wholly impaired doctor may nonetheless practice within "limit[s]," or "continue[]" in his work, just as it would be to compel the medical board to determine that a doctor with full "cognitive" skills may nonetheless and because of physical impairments not be allowed to prescribe medications or consult on medical solutions.

{¶ 12} And we do not understand the legislature to have done that. "Inability" in this context, like "ability" in others, admits of gradations. So (to invoke the first usage example provided at Dictionary.com) when we speak of someone's "inability to make

decisions," we do not necessarily mean that the person *never* can make decisions—just that he may frequently have difficulty doing so, or doing so under certain conditions understood in context. The same might be said of someone's "inability" to refrain from sweets, or to get along with others. That is why, to convey a more absolute context for the word, we sometimes employ adjectives like "complete" or "utter" (or both). *See, e.g., Toledo Bar Assn. v. Cook*, 114 Ohio St.3d 108, 2007-Ohio-3253, ¶ 40 ("As relator observed, [respondent] demonstrated 'a complete inability to act as a lawyer without engaging in habitual acts of fraud and deceit' "); *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 27 (witness concern over individual who "showed a complete inability to identify the information she previously had appeared to understand"); *Shaver v. Wolske & Blue*, 138 Ohio App.3d 653, 667 (10th Dist.2000), quoting *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 309 (3d Cir.1999) ("substantial limitations on major life activities do not have to rise to the level of 'utter inabilities' ").

{¶ 13} Again, "[r]ather than limit our analysis to the 'hyperliteral meaning of each word,' we consider the ordinary meaning of the word as it is used within the surrounding text." *Great Lakes Bar Control* at ¶ 9, quoting Scalia & Garner at 356. Here, the plain language of the statute leads us to conclude that it is only within those spheres where the board finds an "[i]nability" to practice according to acceptable and prevailing standards of care that the board need act. The board is not required to deem Dr. E. entirely unable to practice (or, commensurately, to strip him entirely of his license) when he retains full cognitive abilities; the statute empowers it to "limit" the doctor's license as appropriate to his particular and unfortunate situation. Similarly, the board is not precluded from acting where a doctor maintains abilities as to certain medical activities or procedures but cannot perform others.

{¶ 14} Although we are not aware that the interpretive issue has been presented to courts in the way that Dr. E. formulates it here, our reading of the plain text of the statute as not requiring an "[i]nability to practice according to * * * prevailing standards" to extend to *all* areas and respects of a doctor's practice before triggering board action is consistent with precedent from this court. In *M.M. v. State Med. Bd. of Ohio*, 10th Dist. No. 18AP-839, 2020-Ohio-360, ¶ 9-10, 37, we upheld as in accordance with R.C. 4731.22(B)(19) board limitations on the practice of a doctor who apparently was capable of undertaking "a

low-stress administrative type of practice in which she would not engage in direct patient care." *Compare also Taylor v. State Med. Bd. of Ohio*, 10th Dist. No. 10AP-262, 2010-Ohio-5560, ¶ 20 (board's administrative rule "serves to clarify that the 'unable to practice' language of R.C. 4731.22(B)(19) includes those practitioners * * * who are unable to practice in accordance with acceptable and prevailing standards of care without proper treatment, monitoring, and supervision"); *Flynn v. State Med. Bd. of Ohio*, 10th Dist. No. 16AP-29, 2016-Ohio-5903, ¶ 1, 6 (upholding board order of probation for doctor found "unable to practice * * * due to her mental illness"). *Menkes v. State Med. Bd. of Ohio*, 10th Dist. No. 19AP-476, 2020-Ohio-4656, is not to the contrary; that case did not involve board limitation, revocation, or suspension of a license, or invocation of the "inability to practice" language of R.C. 4731.22(B)(19), but rather related to the board's attempt to impose a reprimand under R.C. 4731.22(B)(22) (by "bootstrapping" from other jurisdictions, as found not applicable) and R.C. 4731.22(B)(5) (making false statements in connection with licensure, found applicable).

{¶ 15} We disagree, then, with Dr. E.'s contention that his ability to practice in some areas precludes the board, under "the plain language of R.C. 4731.22(B)(19)," from directing that he not perform "the invasive procedures relevant here." *Compare* Appellant's Brief at 32. And while his second assignment of error urges that the board's order "did not establish impairment under the plain meaning of R.C. 4731.22(B)(19)," its argument is grounded entirely in his interpretive views and not on propositions relating to the facts before the board. *See* Appellant's Brief at iv (assignment submitting that board's order "is contrary to law"), 29-35 (argument that "inability" contemplates only complete inability). We overrule the second assignment of error.

{¶ 16} Because Dr. E.'s fourth assignment of error does at least touch on evidence that the board considered in limiting Dr. E.'s license, we turn next to that proposition. Dr. E. argues that board reliance on the opinion of its assigned neurological expert, Dr. Joseph Hanna, violated Dr. E.'s right to due process because the board needed to hear from someone (or, presumably, some persons) knowledgeable both about his physical impairment and about the specific nature of the invasive procedures from which he is barred. *See* Appellant's Brief at 44 (board needed to "secure[] an individualized assessment by an expert of not only Dr. [E.'s] disability but also one knowledgeable about cardiac

electrophysiology procedures in order to competently assess whether Dr. [E.] could safely perform them"). Among Dr. E.'s complaints here is that the board's designated expert "equated the mere possibility of a seizure [in the course of performing invasive procedures] with a direct threat to patient safety." *Id.* at 43; *see also id.* at 45 ("THIS neurologist, Dr. Hanna, is not qualified to evaluate Dr. [E.'s] practice * * * * Further, the Board failed to consider reasonable accommodations and relied on the mere potential that a seizure could disrupt a procedure, all of which deprived Dr. [E.] of a fair hearing").

{¶ 17} Although cloaked in terms of a constitutional argument (the board hearing "superficially satisfied due process," but "was terribly flawed" as not relating to evidence " 'appropriate to the nature of the case' "), *id.* at 43, it really is an argument that the trial court should have recognized that the board lacked sufficient evidence upon which to base its finding of impairment and the resulting practice limitations. *See id.* at 44 (arguing that the board was wrong to consider the opinion of a neurological expert who assertedly could not "competently assess whether Dr. [E.] could safely perform" cardiac electrophysiology procedures); *see also* Reply Brief at 20 (same). Indeed, in the very decision that Dr. E. cites to support this proposition, *Leak v. State Med. Bd. of Ohio*, 10th Dist. No. 09AP-1215, 2011-Ohio-2483, at the start of the very paragraph (¶ 12) from which he quotes in both his opening brief and his reply, we noted: "This assignment of error [there urging that the common pleas court had abused its discretion in finding that the board's order was supported by sufficient evidence in that the experts were "inherently unreliable" because they were neurologists and not pain medication experts] essentially questions whether there was reliable, probative, and substantial evidence in the form of testimony supporting the board's disciplinary order against Dr. Leak." *Compare Leak* at ¶ 12 *with* Appellant's Brief at 44 and Reply Brief at 19.

{¶ 18} That understanding of Dr. E.'s position will inform the bulk of our analysis here. To be clear, however, we do not believe that the board's having a neurologist opine on the risk that Dr. E. could pose by undertaking invasive procedures despite being subject to seizures is in and of itself a violation of due process under these circumstances where notice and the opportunity to be heard are not at issue. Dr. E. refers us to no authority for any such specific proposition: again, his concern here as argued under this assignment is at root that the board lacked an appropriate evidentiary foundation for its conclusions.

{¶ 19} To begin, we observe that Dr. E.'s attack on the board's use of Dr. Hanna's ultimate conclusion that Dr. E. should not be performing invasive procedures, including cardiac electrophysiology, is relevant only to the extent that Dr. E. contests that conclusion. *See* Report & Recommendation at 27 (reflecting Dr. Hanna's "opinion to a high degree of medical certainty that, although Dr. [E.] is capable of practicing general cardiology without restriction, * * * he is not capable of performing invasive procedures, including all procedural cardiac electrophysiology, according to acceptable and prevailing standards of care"). As to what extent he does contest that conclusion, we find his briefing at least somewhat opaque. *Compare* Appellant's Brief at 31 ("Dr. Hanna's opinion was limited to one discreet subspecialty, cardiac electrophysiology, an area in which Dr. [E.] voluntarily has not practiced since 2010"), and *id.* at 41 ("complete lack of imminent harm as Dr. [E.] has voluntarily ceased practicing in this area of medicine"), *with id.* at 42 (seeking remand under antidiscrimination rationale for board fact finding on "the existence of any direct threat from performing the cardiac electrophysiology Dr. [E.] testified he was qualified to perform"), *id.* at 45 (board "relied on the mere potential that a seizure could disrupt a procedure" and failed to consider "reasonable accommodations" [earlier identified as including an approach in which the doctor would take "a short 15 minute break" during a procedure should seizures warrant, *see id.* at 39-40]).

{¶ 20} Concluding that Dr. E. does seek to challenge the board's determination of his physical inability to engage in invasive procedures consistent with patient safety, we rehearse the familiar standards of review that obtain in this case. "Our role in reviewing the common pleas court's appellate review of an administrative appeal is limited to determining [whether] the common pleas court abused its discretion." *M.M.*, 2020-Ohio-360, at ¶ 23 (citations omitted). "An abuse of discretion occurs when a trial court's discretionary judgment is unreasonable, arbitrary, or unconscionable," or relies on an error of law (reviewed de novo, as noted above). *Id.*

{¶ 21} As the common pleas court here recognized, in administrative cases governed by R.C. 119.12, after review of all the evidence, "a reviewing trial court must affirm the order of the [administrative body] if it is supported by reliable, probative and substantial evidence and is in accordance with law." Decision & Entry at 5, citing *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 111 (1980); *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993)

(further citation omitted). " '(1) "Reliable" evidence is dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true. (2) "Probative" evidence is evidence that tends to prove the issue in question; it must be relevant in determining the issue. (3) "Substantial" evidence is evidence with some weight; it must have importance and value.' " *Id.*, quoting *Our Place v. Liquor Control Comm.*, 63 Ohio St.3d 570, 571 (1992).

{¶ 22} As the common pleas court further understood, its review of the administrative record was not to be de novo, but rather " 'a hybrid review in which the court must appraise all the evidence as to the credibility of the witnesses, the probative character of the evidence and the weight thereof.' " *Id.* (citations omitted). The common pleas court needed to accord " 'due deference to the administrative agency's resolution of evidentiary conflicts,' " and to its "interpretation of the technical and ethical requirements of its profession." *Id.* at 5-6 (citations omitted).

{¶ 23} Pursuant to the explicit authority of R.C. 4731.22(B)(19), the board appointed Dr. Hanna to conduct a neurological examination of Dr. E. *See* Decision & Entry at 3; August 19, 2019 board hearing Tr. at 27. The record reflects that Dr. Hanna, who is a well credentialed neurologist and not a cardiologist versed in the intricacies of cardiac electrophysiology, prepared a report and subsequently testified before the board's hearing examiner. He recounted that Dr. E. "has a tumor on the right side of his head and inside of his brain that is made of cells that are malignant and are difficult to control and cure." Tr. at 43. The tumor "sits in the right sensory motor cortex * * * * [W]hen the electrical discharges occur in that area and scarring occurs because of radiation and the tumor, the discharges then will set off * * * sensory symptoms on his left side * * * which includes the left side of his mouth and his left arm. * * * * Seizures are chaotic and random. And because of that, it's impossible to predict when they might occur." Tr. at 44. Dr. Hanna described his "simpleton's understanding" of cardiac electrophysiology as involving placement of "a catheter into your heart that has an electrophysiologic program for which they stop and start the heart." Tr. at 33. He concluded: "A seizure occurring during a procedure could jeopardize a patient. Therefore, I do not recommend that he resume performing any procedures including all procedural cardiac electrophysiology." July 11, 2017 Report (Ex. 5) at 2; *see also* Tr. at 44-45 (seizure during a procedure "could then end in a problem with

the patient or the patient could be harmed").  He understood Dr. E. to agree that he could not perform invasive procedures.  Tr. at 47-48.

{¶ 24} Dr. E.'s argument here boils down to a contention that Dr. Hanna doesn't know enough about the intricacies of cardiac electrophysiology to understand whether it could be bad for a patient to have her doctor suffer a seizure during the procedure.  For several reasons, we are not persuaded that the trial court abused its discretion in finding that "the Board's order limiting and restricting Dr. [E.'s] practice of medicine * * * is supported by reliable, probative and substantial evidence."  Decision & Entry at 15.

{¶ 25} *First*, and we think dispositively, Dr. E. does not challenge or make any parallel argument here with regard to the board's reliance on other doctors who reached conclusions similar to Dr. Hanna's.  The hearing examiner's second (of two) findings of fact emphasized that "[a]dditional evidence of inability to perform invasive cardiac electrophysiology procedures according to acceptable and prevailing standards of care includes the opinions of two of Dr. [E.'s] treating physicians, Drs. Stevens and Najm, [who] have also expressed opinions that there should be limitations and/or restrictions on Dr. [E.'s] performance of procedural cardiac electrophysiology."  Report & Recommendation at 28; *see also id.* at 5-7 ("Dr. [E.] understood Dr. Stevens' [2010] admonishment to mean that he had to stop performing procedures that involve putting wires in the heart and manipulating catheters in the arterial flow. * * * Dr. [E.] further testified that Dr. Stevens referred him to Dr. Najm, the head of epileptology at the Cleveland Clinic concerning what Dr. [E.] can and cannot do," and that in 2011 Dr. Najm " 'said he's not changing his mind, he will never clear me to return to work' " given the chance of cancer and seizure progression. " 'So I needed a second opinion, and I sought Dr. Luders * * * and unfortunately that opinion by Dr. Luders in 2011 was similar.  He said if you go well controlled on antiepileptic drugs for five years [a condition that never was met, given several "somatosensory events" in 2014 and another seizure in 2018], then I will clear you to return to work"); *id.* at 20-21 (hearing examiner summarizes Dr. Hanna testimony that Dr. Stevens's views as expressed in a May 1, 2019 letter "reached about the same conclusion that Dr. Hanna had made in 2017, which is that Dr. [E.] is okay to practice general cardiology but should not practice cardiac electrophysiology out of concern for a reoccurrence of a seizure").

{¶ 26} The hearing record bears all that out.  At the request of Dr. E.'s counsel, Tr.
at 222, the hearing examiner admitted as Dr. E.'s exhibit C the May 1, 2019 letter from
Dr. Stevens, Section Head of Adult Neuro-Oncology at the Cleveland Clinic, that concludes:

> Dr. [E.] is interested in maintaining a clinical practice in the
> field of Cardiology if possible.  Our stance has been and
> continues to be that he not be involved with invasive
> procedures secondary to the *concerns about seizure
> recurrence while doing a procedure* and he understands that.
> At this point in time, based on the findings of his
> Neurocognitive testing[,] I would support his reentry into
> medical practice based on his board certification *as long as he
> is not performing procedures.*

Ex. C at 3 (emphasis added).  The record also includes a communication dated September
29, 2011 from Dr. Najm, Director of the Cleveland Clinic's Epilepsy Center, reciting in part:
"As I stated to [Dr. E.] during previous visits and due to the fact that his seizures are most
likely due to the anaplastic lesion and/or its effect on the surrounding perirolandic cortex
on the right, I informed him again that working as an interventional Cardiologist may not
be possible because of safety issues related to his patients. * * * * My recommendation is
that he * * * avoid any activity that[,] should a seizure occur[], his life and or his safety or
that of his patients be at risk.  Dr. [E.] stated that he would like to consider a second expert
Epilepsy opinion."  Board's Hearing Ex. 5a.  And the record also includes an October 19,
2016 letter from Dr. Hans Luders, Professor of Neurology, expressing his view that a return
by Dr. E. to performance of invasive procedures should be conditioned on Dr. E.'s "not
hav[ing] any further seizures" and showing "no evidence suggesting a recurrence of his
anaplastic oligoastrocytoma." (Unfortunately, both of those conditions had failed as of the
time of the board hearing, as some signs of cancer had manifested themselves again and he
had suffered another seizure in 2018.  *See* Tr. at 185 [seizure triggered by driving], 188-89,
195 [area of concern now limited and "stable"].)

{¶ 27} The common pleas court underscored these additional bases for the board's
conclusions:

> [I]t must be emphasized that Dr. Hanna's well-reasoned
> opinion does not exist in a vacuum. Rather, it is complemented
> by three other respected physicians that treated Dr. [E.]  First,
> Dr. Stevens directed [Dr. E.] as his own patient not to perform
> invasive procedures and electrophysiology, given the seizures

he was experiencing. (Tr. at 135, 137). Next, Dr. Najm at the Cleveland Clinic conveyed an even more restrictive and permanent set of limitations. (Tr. at 136, 152). Lastly, Dr. Luders was sought by [Dr. E.] to give "a second opinion." The latter was slightly more favorable in that he qualified that the proscription from invasive procedures could be lifted if the seizures were controlled for a sustained period. (Tr. at 153, 155). However, the record reflects that [Dr. E.]'s cancer returned, leaving him short of Dr. Luders' recommended five years of control of his seizures. (Tr. at 193).

Decision & Entry at 20.

{¶ 28} Dr. E.'s fourth assignment of error does not address these additional bases for the board's conclusions, or this part of the common pleas court's decision. Even without Dr. Hanna's testimony, the common pleas court's determination that the board's order was supported by reliable, probative, and substantial evidence would not have been an abuse of discretion.

{¶ 29} *Second*, Dr. E.'s argument that the opinion of a neurologist alone concerning whether his physical condition should preclude performing invasive procedures, including all cardiac electrophysiology procedures, is somehow not "appropriate to the nature of this case," Appellant's Brief at 44, is undercut by the logic of his own account. Dr. E. testified that when Dr. Najm told him that the risk of future seizures "should preclude [him] from practicing invasive electrophysiology of all types, simple EP, not only the complex stuff," he was "shocked." Tr. at 152. He asked whether Dr. Najm really meant to say that the potential for "one 15-minute period [out of an entire year] where I have some numbness" should preclude him from performing "any invasive work whatsoever, and [Dr. Najm] said, yes, that's right. So I needed a second opinion, and I sought Dr. Luders" (whose opinion also left him unsatisfied). *Id.* at 152-53. As described by Dr. E., then, the "second opinion" that he wanted was as to whether his disease should preclude him from doing "any invasive work." And he sought that second opinion from Dr. Luders—a neurologist.

{¶ 30} *Third*, Dr. E.'s argument never explains to us with any factual specificity why Dr. Hanna's "very rudimentary understanding of the practice of cardiac electrophysiology" should not have been sufficient to allow him to opine on the risks to patient health posed by someone of Dr. E.'s particular neurological condition performing that invasive procedure. *See* Appellant's Brief at 44-45. Dr. E. suggests to us that Dr. Hanna should have

consulted "with another physician who practiced in the area of cardiac electrophysiology," *id.* at 44, but Dr. Hanna interviewed Dr. E. himself. Dr. Hanna testified that he and Dr. E. had discussed "in depth" the concern that a seizure during such a procedure could result in harm to the patient. Tr. at 45. Dr. Hanna was under the impression that he and Dr. E. "were in complete agreement when he left the office about what we thought he could do and not do." *Id.* at 47; *see also id.* at 47-48 (Q. "Was it that he agreed he could not do invasive procedures?" A. "Yes.").

{¶ 31} It is worth repeating in this regard that the practice restrictions recommended by Dr. Hanna in his report were being observed by Dr. E. of his own volition to that point. Dr. E. "voluntarily" had not practiced cardiac electrophysiology "since May of 2010"—some seven years before Dr. Hanna was asked to conduct the physical examination. Appellant's Brief at 3-4. And Dr. E. concedes that cardiac electrophysiology involves "invasive procedures." *See*, *e.g.*, *id.* at 32 (discussing "the Board's reliance on Dr. Hanna's opinion that Dr. [E.] can fully practice certain areas of medicine, but not the invasive procedures relevant here"), *id.* at 38 (reaffirming that Dr. E. has "not performed the subject invasive procedures since 2010 – long before the Board's involvement"). Moreover, Dr. E.'s suggestion to us that any seizures during the procedure could be addressed by "taking a short 15 minute break," *id.* at 40, *see also* Tr. at 124-25 (Dr. E. avers that certain procedures "can be performed and you can step away from the table for 15 minutes at a time and there's no issue, right") might reasonably be construed to cut against his argument that Dr. Hanna should not have been heard on whether the neurological diagnosis "actually affects the performance of certain procedures," *compare* Reply Brief at 18.

{¶ 32} In any event, this is not a case like *Leak* where one doctor described what another's standard of care should have been in particular instances. Rather, Dr. Hanna here took the general description of the cardiac procedures at issue, applied his own neurological expertise to the situation in light of Dr. E.'s illness, and formed a conclusion that Dr. E. should not be conducting invasive procedures of any sort. We are aware of no precedent or other authority that would bar Dr.Hanna from rendering this opinion unless he had cultivated an encyclopedic knowledge of every sort of invasive procedure involving people's hearts. It is true that "a medical expert well-versed and well-credentialed in one

field may not be an expert in other medical fields." *Leak* at ¶ 12, citing R.C. 2743.43(A)(3) (involving preclusions on testimony regarding liability issues in a medical claim). But Dr. Hanna was well within his expertise to discuss potential seizures that could affect Dr. E. during the conduct of invasive procedures, and the trial court did not abuse its discretion in determining that Dr. Hanna's testimony, in combination with the evidence involving Dr. E.'s treating physicians, provided "more than" the required reliable, probative, and substantial evidence needed to support the board's order. *See* Decision & Entry at 21. *Compare M.M.* at ¶ 2 (R.C. 4731.22(B)(19) case cited by common pleas court here; upholding affirmance of board preclusion of "direct patient care" by doctor, based on psychiatric testimony); *Parrott v. State Med. Bd. of Ohio*, 10th Dist. No. 15AP-963, 2016-Ohio-4635, ¶ 3, 10, 20-22 (case under R.C. 4731.22(B)(26) involving impairment of radiologist's ability to practice because of substance abuse turned not on radiological expertise but on diagnosis of the impairment; also cited by common pleas court here).

{¶ 33} *Fourth*, even were we to examine this assignment of error not for abuse of discretion involving the question of evidentiary sufficiency, but rather under a standard of de novo review, we could not say in the context presented here that a constitutional rule requiring fair process marked Dr. Hanna's straightforward testimony as somehow substantively incompetent. The board was apprised of Dr. Hanna's background and neurological expertise, and also was informed that he disclaimed detailed knowledge of cardiac electrophysiology. "[W]hen reviewing a medical board's order, courts must accord due deference to the board's interpretation of the technical and ethical requirements of its profession." *Pons,* 66 Ohio St.3d at 621. As in *Pons*, here too "the medical board [was] quite capable of interpreting technical requirements of the medical field," *id.* at 623, citing *Arlen v. State Med. Bd. of Ohio*, 61 Ohio St.2d 168, 173 (1980).

{¶ 34} Dr. Hanna was cross-examined by Dr. E.'s lawyer, and Dr. E. also testified before the board's hearing examiner. Due process did not require the board to defer to Dr. E. on proposed "accommodations" such as the suggested "short 15 minute break" during invasive cardiac procedures, *compare* Appellant's Brief at 45, 40, nor did it require the board to await some actual harm to a patient before acting to ensure against "the mere potential that a seizure could disrupt a procedure," *compare id.* at 45. The Supreme Court of Ohio has reiterated that the General Assembly has provided for " ' "administrative

hearings in particular fields * * * to facilitate [resolution of a profession's technical and ethical requirements] by placing the decision on facts with boards or commissions composed of [people] equipped with the necessary knowledge and experience pertaining to a particular field." ' " *Pons* at 622, quoting *Arlen* quoting *Farrand v. State Med. Bd. of Ohio*, 151 Ohio St. 222, 224 (1949).

{¶ 35} In a broad variety of circumstances, the board, and courts reviewing board administrative actions, may appropriately " 'rely on the Board's own knowledge' " involving medical questions. *Flynn*, 2016-Ohio-5903, at ¶ 39, quoting *Walker v. State Med. Bd. of Ohio*, 10th Dist. No. 01AP-791 (Feb. 21, 2002); *compare M.M.*, 2020-Ohio-360, at ¶ 35 (agreeing that the board's reliance on the expert psychiatric testimony there was not "unfounded," but rather entitled to significant deference). And in *Flynn*, we quoted from *Ridgeway v. State Med. Bd. of Ohio*, 10th Dist. No. 07AP-446, 2008-Ohio-1373, ¶ 25, in observing that "it is 'within the province of the medical board to consider the issue of impairment even in the absence of evidence of a specific incident of patient harm.' " *Flynn* at ¶ 19, quoting *Ridgeway* at ¶ 25. *Flynn* was an R.C. 4731.22(B)(19) case that drew upon *Ridgeway*'s discussion (in the related R.C. 4731.22(B)(26) context) of precedents from across the country that medical boards in appropriate circumstances can act to prevent future harm even where not "presented with evidence that actual patient harm has already occurred," *see Ridgeway* at ¶ 20. Because "[o]ne aspect of the Board's function is to care for the safety of the public * * * *[,] [i]t therefore is entirely appropriate to take prophylactic steps when a licensed physician is impaired." *Smith v. State Med. Bd. of Ohio*, 10th Dist. No. 11AP-1005, 2012-Ohio-2472, ¶ 19 (R.C. 4731.22(B)(26) case). Under the circumstances presented here, and absent some identified defect in the process employed to consider such matters, board evaluation of the potential for future harm to the public does not amount to a violation of due process.

{¶ 36} We overrule Dr. E.'s fourth assignment of error.

{¶ 37} But, Dr. E. argues pursuant to his third assignment of error, precisely because "the sole basis" of the board's action "was his physical disability," Appellant's Brief at 37 (emphasis deleted), the trial court erred in not finding that the board's order violates laws against disability discrimination. We do not agree. Certainly Dr. E. has not engaged in misconduct and has no wrongdoing "to excuse," *compare id.*; nonetheless, and again, the

board is not precluded under these circumstances from making its professional determination that Dr. E. is not at this time qualified to perform invasive cardiac procedures.

{¶ 38} We held in *Flynn* that where the board has determined within the scope of its powers that a doctor's "illness renders her unable to practice medicine and surgery according to acceptable and prevailing standards of care, the Board's order taking action against her license under R.C. 4731.22(B) [does] not violate the [federal or state laws against disability discrimination]." 2016-Ohio-5903 at ¶ 20. Those laws, we said, extend only to a "qualified individual with a disability," and the board is empowered on an appropriate record to determine in the interest of patient health that a doctor is not qualified to practice outside of specified limitations. *Id.* at ¶ 14, 16 (adding that " '[t]he very nature of the police powers exercised by state boards of medicine require the state to discriminate on the basis of, among other considerations, a mental condition harmful to the public's safety,' " quoting *Alexander v. Margolis*, 921 F. Supp. 482, 488 (W.D.Mich. 1995)).

{¶ 39} Dr. E. urges that "[t]he Board's assertion that [his] medications control his condition but do not eliminate all risk of a potential seizure is without merit as no medication completely eliminates all risk." Reply Brief at 15. That argument defeats itself. The design of the board's order is to limit the risk to patients that the various neurologists indicated would exist were Dr. E. to resume performing invasive cardiac procedures. If medication could "eliminate[] all risk," the arguments and the board's position could be different. And Dr. E.'s unadorned argument that he must be deemed a qualified individual for purposes of the Americans with Disabilities Act because that law "does not permit the Board to license only those individuals whose disabilities have been cured," *id.* at 16, would in this context, at least without more nuanced submission, read the word "qualified" out of the act. *Compare* 42 U.S.C. 12132 (providing that "no qualified individual with a disability shall, by reason of such disability, be * * * subjected to discrimination by [a public entity]"). The antidiscrimination laws do not prevent the board from exercising its responsibility to take patient safety into account in light of Dr. E.'s physical condition.

{¶ 40} Dr. E. seems to argue further that because he "has not practiced cardio electrophysiology since 2012," the board lacked necessary evidence "of any direct threat

from performing the cardiac electrophysiology [Dr. E.] testified he was qualified to perform."  Reply Brief at 17-18.  Again, this argument is in some considerable tension with itself.  And nothing required the board to adopt Dr. E.'s own testimony as to his current capabilities notwithstanding what the trial court found to be reliable, probative, and substantial neurological evidence to the contrary.  A reviewing common pleas court " ' "must give due deference to the administrative determination of conflicting testimony, including the resolution of credibility conflicts." ' " *M.M.*, 2020-Ohio-360, at ¶ 22, quoting *Glasstetter v. Rehab Servs. Comm.*, 10th Dist. No. 13AP-932, 2014-Ohio-3014, ¶ 14 (further citations omitted).

{¶ 41} The board did assess the conflicting positions.  Board member Dr. Schottenstein, for example, "stated that he is sympathetic to Dr. [E.'s] frustration expressed during his testimony in which he stated that he did not feel he could get the specialists who assessed him or the Board members to understand that there is a difference between a somatosensory seizure and a motor seizure."  November 13, 2019 Board Meeting Minutes at 5.  "However," Dr. Schottenstein continued, "Dr. Hanna was clear to address this point in his testimony and indicated that it is a distinction without a difference because a sensory impairment of a limb [such as an arm] means that one cannot carry out movement in a controlled way since feedback is necessary from a sensory standpoint for one's motor functions to occur in a coordinated fashion."  *Id.* at 5-6 (with Dr. Schottenstein adding that "regrettably, he is not comfortable with dismissing this case" and that "the [order as proposed and ultimately adopted] is fair and * * * gives Dr. [E.] the option to remove the limitations if certain criteria are met.  The [order] also allows Dr. [E.] to practice general cardiology in the meantime").  *Id.* at 6.

{¶ 42} We conclude that the trial court did not err in leaving to the informed discretion of the board whether to overlook (or "accommodate") Dr. E.'s condition by reasoning that in the course of conducting invasive procedures he could turn to expedients such as relying on intervention by non-doctor "surgical assistants" or taking "short 15 minute" breaks.  (We also note that entry into the board's new confidential monitoring program as he now proposes would not free him to undertake any invasive procedures.)  We overrule Dr. E.'s third assignment of error.

{¶ 43} Dr. E.'s briefing under his first assignment of error, alleging that the board proceedings were "tainted," hints at various possible arguments before distilling to a contention that board staff "misrepresented Dr. [E.'s] eligibility for the [board's non-disciplinary] confidential monitoring program at the July 2018 meeting [that approved the notice to Dr. E. that the board would consider revoking or limiting his license], thereby initiating the tainted proceedings[,]" and that the board later "believed itself powerless to remedy the initial error. As a result, * * * the misconduct here tainted Dr. [E.'s] hearing to the point of rendering the hearing useless as no evidence could have addressed the formative flaw; therefore, producing a fundamentally unfair process." Appellant's Brief at 28-29.

{¶ 44} Dr. E. has not brought a mandamus action to compel officers of the board to exercise their discretion in a particular way. Rather, his first assignment of error is limited to his contention that board staff misled the board into believing, wrongly he suggests, that he was unwilling to agree to all practice restrictions necessary to gain entry to the confidential monitoring program. *Compare* Ohio Adm.Code 4731-28-03(A) (requiring "written participation agreement") and (B)(4) (requiring "[a]greement" regarding cessation of practice if the secretary and supervising member of the board determine current inability).

{¶ 45} Dr. E. hinges his argument here on board minutes from the July 11, 2018 meeting that authorized the notice of potential board action and his opportunity to be heard. *See* Appellant's Brief at 24-25. Those minutes record that "Dr. Schottenstein asked if the Board is continuing to pursue development of a non-disciplinary monitoring process for practitioners with mental and physical health problems. Dr. Schottenstein also asked if this practitioner could be placed in such a process once it is instituted. Ms. Marshall [of the board staff] replied that, speaking generally and not in relation to this particular case, * * * the non-disciplinary monitoring program is near [to going into operation]. Ms. Marshall added that it is a voluntary program which requires the cooperation of the licensee." July 11, 2018 Board Minutes at 1.

{¶ 46} Dr. E. does not dispute the literal truth of the response, but now reads it to "imply[] that [he] neither wanted to be in [the program] and/or was not cooperative." Appellant's Brief at 24. His lawyer's take on the same passage when speaking to the hearing

examiner, however, was significantly less definitive: "I don't know what she meant by that, but one interpretation might be to suggest to Board members that Dr. [E.] wasn't cooperative. And that is far from the case if that is what was interpreted incorrectly by the Board members * * *." Tr. at 246.

{¶ 47} The common pleas court's decision addressed this matter, noting among other points that the board's July 2018 notice to Dr. E. of his opportunity to be heard apparently "preceded the establishment of the Confidential Monitoring Program." Decision & Entry at 12. The record does support this observation, and Dr. E. does not contest it in his briefing to us. *See* Tr. at 12 (Dr. E.'s lawyer expresses concern that "a month after this case was cited, the Board's confidential monitoring program under OAC 4738.21 came into effect"); *see also* Ohio Adm.Code 4731-28-02, 4731-28-03 (establishing rules for eligibility for and participation in confidential monitoring program, effective August 31, 2018).

{¶ 48} The trial court also acknowledged the broad discretion that the board now has in determining eligibility for the program, and was "disinclined to invade that learned province * * *." Decision & Entry at 12. Further still, the trial court found that "a genuine disagreement that was the primary subject of the [subsequent] administrative hearing focused [on] the extent of [Dr. E]'s physical illness [and, we would say, on the extent to which that illness should preclude him from conducting invasive cardiac procedures]. This stands in contrast to the so-called 'stipulation' necessary" to enter the new program under Ohio Adm.Code 4731-28-03. *Id.* at 12-13. Dr. E.'s brief disputes that review of the record, and says that the common pleas court also "reference[d] a dispute that does not exist anywhere in the record where it cites Dr. [E.] and the Board being 'at odds' over the language in a 'participation agreement' * * *." Appellant's Brief at 26 (citing to the Decision & Entry at 10, which actually characterized the argument of the board as to why Dr. E. was "effectively precluded * * * from participation").

{¶ 49} But nowhere does Dr. E.'s briefing cite us to any statement by Dr. E. at his hearing or to the board thereafter that he would agree going forward to abstain from all invasive cardiac procedures including cardiac electrophysiology. His counsel had inquired about the then-prospective program in February of 2018, and the board investigator responded that "someone like your client would likely be eligible for the program" once it

went into effect in several months.  *See* hearing Ex. U (Feb. 22, 2018 e-mail).  Dr. E. testified that he thought the program "should have been offered to [him]," but that he was not aware of its specifics.  Tr. at 212-13 (also saying that his practice had been "on hold" pending completion of the board investigation).  And his lawyer told the hearing examiner that "what should have happened in this case" was for the board to have placed Dr. E. into the program.  Tr. at 247.  But nowhere we see in the record (or even in the briefing to us, on close inspection) do we find a clear and unequivocal expression by Dr. E. of agreement that he will not undertake any further cardiac electrophysiology.  We have no reason to gainsay the common pleas court's reading of the record, let alone to determine that that court abused its discretion in its findings.

{¶ 50} The general tenor of Dr. E.'s position as articulated to the hearing examiner (consistent even with the general tenor of much of his briefing to us, with his repeated assertions that he could take a 15-minute break to wait out any seizure during a procedure) suggests that he was at best (understandably) reluctant to concede that he ought not perform any type of invasive cardiac procedure at all—or at least we cannot say that the trial court abused its discretion in reading the record that way, *see* Decision & Entry at 12-13.  Dr. E.'s Reply Brief labels as "incorrect" the view that " 'the Board and Dr. [E.] were not in agreement on how his license should be restricted,' " Reply Brief at 4 (quoting Appellee's Brief at 20).  Such arguments, Dr. E.'s briefing submits, "are based on conjecture and not on the record."  Reply Brief at 4.  "The Board had the opportunity to present evidence of such asserted disagreement; however, there is absolutely nothing in the record to support these unfounded assertions, which are not evidence," he repeats.  *Id.*  But *Dr. E.* is the party asserting a due process violation, and while such an agreement makes eminent sense in the abstract, he cites us to no statement from him establishing his position on the matter as expressed to the board or to board staff.  Indeed, he does not directly tell us, with or even without citation, that at the time the board acted he was prepared without equivocation to forswear all future invasive cardiac procedures of any sort.

{¶ 51} Rather, it seemed his position that someone who truly understood the intricacies of his practice would perforce acknowledge that there were some types of electrophysiology procedures he could perform.  At least that was the hearing examiner's take, as supported by citations to Dr. E.'s testimony.  *See* Report & Recommendation at 22-

24 ("Dr. [E.'s] Testimony Concerning his Ability to Practice Cardiac Electrophysiology"). As the hearing examiner recited, Dr. E. testified that "where I have issue with a simpleton's approach to electrophysiology, is that it is not like [Dr. Hanna] says. [We note that the word 'simpleton' in this context originated with Dr. Hanna.] It is not like Dr. Hanna thinks, it is not that [all or nothing] type of specialty. And I'm not sure that Dr. Stevens knows. I don't know that Dr. Peereboom knows that most of electrophysiology is not time sensitive." *Id.* at 22, quoting Tr. at 123-27. The report continued, still quoting Dr. E.: "As long as you have cognitive function, you can deal with arrhythmias that aren't induced. In fact, it doesn't involve moving the wires, okay. It involves evaluating where that arrhythmia was coming from. It involves taking appropriate action to convert that, but that is basically a verbal response given to the person running a stimulator that applies the electrical impulses. * * * * So most of the procedures, pacemakers, implanted defibrillators, regular EP studies and even ablations can be performed and you can step away from the table for 15 minutes at a time and there's no issue, right. They're not in arrhythmia. You converted the arrhythmia already." *Id.*

{¶ 52} More from Dr. E. as emphasized by the hearing examiner: "And in fact, you're encouraged that it is a cognitive specialty, it is not like an angioplasty plumber where they're always moving, they're shooting into the arteries in the heart and in the brain * * * and during that timeframe their heart is deprived of oxygen and that. It is not like that in electrophysiology." *Id.* at 22-23. "It is a cognitive specialty and involves evaluation mathematically of the rate of the arrhythmia, the origin of the arrhythmia and you do that by monitoring all these different wires inside of the heart, but you're not moving them. You place them for about a ten-minute timeframe at the beginning of the procedure. Once they're in place, they are sometimes moved but almost never if you put them right." *Id.* at 23.

{¶ 53} Certain more complicated or physically involved types of electrophysiology could be distinguished from other types, as the hearing examiner recounted Dr. E.'s testimony, "and it could be limited easily," the doctor testified, "by saying, hey, you cannot perform those procedures. But Dr. Stevens doesn't know that, Dr. Njam doesn't know that, Dr. Hanna obviously didn't know that and doesn't understand that, and I'm not sure - - I

couldn't even get the Board to understand that there's a difference between a somatosensory seizure and a motor seizure." *Id.* at 23-24 (still quoting Dr. E.).

{¶ 54} The hearing examiner also noted that "during a June 6, 2018 deposition there was a discussion concerning what invasive procedures Dr. [E.] might be able to perform. He testified that placement of a central venous catheter is invasive but would involve no risk to the patient. Dr. [E.] further testified that nurses and nurse practitioners perform this procedure." *Id.* at 24, citing Ex. 3 at 17.

{¶ 55} Dr. E.'s reliance on our decision in *Mansour v. State Med. Bd. of Ohio*, 10th Dist. No. 14AP-829, 2015-Ohio-1716, is misplaced. In that case, we found that a board order was not in accordance with law because of a mistaken evidentiary ruling that had denied access to a respondent's earlier interrogatory responses. No such issue is involved here, where Dr. E. expressed his position at length. Although he now accuses board staff of "misrepresentations * * * about [his] eligibility for the confidential monitoring program," Reply Brief at 6, he nowhere directly states his unequivocal commitment to the preclusions on future conduct that such an agreement would have required. And assertions that the board lacks proof on its side do not compensate for his failure to establish his allegations.

{¶ 56} The common pleas court did not abuse its discretion in finding that the record did not reflect a meeting of the minds between Dr. E. and the board as to what the limitations on Dr. E.'s practice should be. It also did not err in finding that "the record does not reflect that [Dr. E.] was denied due process. He was extended a reasonable notice and opportunity to be heard. He appeared and participated in an administrative hearing, where he was represented by counsel. [He] was afforded an opportunity to call witnesses, as well as the ability to cross-examine opposing witnesses, and introduce legal argument." Decision & Entry at 13.

{¶ 57} At the November 13, 2019 board meeting that imposed the limitations on Dr. E.'s practice, Dr. Schottenstein reflected again on the monitoring program (as implemented by that point). "Dr. Schottenstein wished this case had proceeded under the confidential non-disciplinary monitoring program. However, it did not and now the Board has to see the case through. Based on his experiences with other cases, Dr. Schottenstein stated that there may have been a variety of different reasons why the Board moved in the

direction of a formal hearing rather than the confidential program."  November 13, 2019 board minutes at 6.

{¶ 58}  Although we overrule Dr. E.'s first assignment of error, we are constrained to note potential merit in the board's apparent consensus that "everyone supports a non-disciplinary track for situations of this nature."  November 13, 2019 board minutes at 6 (paraphrasing Dr. Schottenstein echoing Dr. Feibel).  Dr. E. has had a distinguished career and has worked bravely to overcome to the extent possible the effects of the insidious disease that besets him.  While we are not in a position to apportion blame for the failure of Dr. E. and the board to arrive at a practice limitation agreement consistent with the public interest, nothing in this decision should be interpreted to dissuade the board, on its part, from reviewing this case study and implementing or suggesting whatever further reforms it may find best serve its public mission.

{¶ 59}  The involvement of the judiciary here is cabined by the law.  "In an appeal from a medical board's order, a reviewing trial court is bound to uphold the order if it is supported by reliable, probative, and substantial evidence, and is in accordance with law. * * * The appellate court's review is even more limited than that of the trial court.  While it is incumbent on the trial court to examine the evidence, this is not a function of the appellate court.  The appellate court is to determine only if the trial court has abused its discretion, *i.e.*, being not merely an error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency [or, we note, misunderstanding of law].  Absent an abuse of discretion on the part of the trial court, a court of appeals may not substitute its judgment  for those of the medical board or a trial court.  Instead, the appellate court must affirm the trial court's judgment." *Pons*, 66 Ohio St.3d, at 621.  We do so here.

*Judgment affirmed.*

KLATT and JAMISON, JJ., concur.

NELSON, J., retired, of the Tenth Appellate District, assigned
to active duty under the authority of the Ohio Constitution,
Article IV, Section 6(C).

_____